KORN v. CHESAPEAKE & O. RY. CO.

(Circuit Court of Appeals, Sixth Circuit. July 7, 1903.)

No. 1,173.

**1. CARRIERS—EJECTION OF PASSENGER—DEATH—LIABILITY OF CARRIER—EVIDENCE.**

Plaintiff's intestate boarded a passenger train about 7 o'clock at night, apparently under the influence of liquor, but sensible of his surroundings and capable of controlling his movements. After the train started, he refused to state his destination or pay his fare, and was ejected at a point about 300 yards from the station, with lighted houses near. The next morning he was found near the track, dead, either from exposure or cocaine poisoning. *Held*, the conductor was justified in ejecting him from the train under the circumstances.

**2. SAME—STATION AGENT—NEGLIGENCE—SCOPE OF AUTHORITY.**

Plaintiff's intestate passed a part of the afternoon, before he boarded the passenger train, in the station, apparently in a stupor resulting from the use of liquor or drugs. The station agent knew this, but did not inform the conductor of the train. *Held*, that the knowledge of the station agent could not be imputed to the company, because it was no part of his duty to pass upon the intestate's fitness to travel, or give the conductor information upon that point.

In Error to the Circuit Court of the United States for the Western Division of the Southern District of Ohio.

This was an action brought by the administrator of John J. Korn, deceased, to recover damages for the death of Korn through the negligence and

---

¶ 1. Liability of carrier for injuries to passengers caused by negligence or torts of servants, see notes to Texas & P. Ry. Co. v. Williams, 10 C. C. A. 466; The Anchoria, 27 C. C. A. 651.

See Carriers, vol. 9, Cent. Dig. § 1454.

wrongful act of the defendant railway company. The trial judge instructed the jury to return a verdict for the defendant, on the ground that he was unable to find, on the uncontroverted facts, that there was any wrongful act on the part of the trainmen representing the defendant which was the proximate cause of the death of Korn. A motion for a new trial having been overruled, the case has been brought here for review.'

The facts shown by the plaintiff's evidence are stated with substantial accuracy in the opinion of the court below overruling the motion for a new trial:

"The deceased came to the station of the defendant in South Portsmouth about 2 o'clock in the afternoon of the 28th day of January, 1898, and remained there until about 7 o'clock in the evening, when he entered one of the trains of the defendant going East, as a passenger. When he came to the station, he was in an almost helpless condition. His manner and appearance indicated that he was under the influence of drugs or intoxicating liquor. He was allowed to lie down in the telegraph office, and part of the time he sat about the public room of the station, asleep or apparently asleep. Near the time of the arrival of the evening train going East, the station agent, who was about to go off duty and cross the river to Portsmouth, Ohio, roused him up and endeavored to persuade him to go with him to Portsmouth, where he could be cared for; but the fresh air seemed to revive him, and he refused to go to Portsmouth. He tried to board the rear car of the train, which had just come in. Glockner, the station agent, told the trainman that he had no money, and was not fit to go on the train, and the trainman pushed him off and closed the door. He then went up to the middle of the train, and climbed up the steps of the day coach, between the day coach and the smoker. The conductor then came up, and was told by the witness Charles Molster that the deceased was not fit to travel, and Molster, or some of those standing about, also told the conductor that he had no money; but the deceased produced a bag of silver, and the conductor then said, 'I guess we will have to take him,' and pushed him from the day car into the smoker. The witness Boughner says that, shortly before the train arrived, deceased was walking up and down the platform; that, when roused up by the station agent, he seemed to have his presence of mind, and knew where he was going and what he was doing.

"The witness Howe says: 'He came out and hollowed to him to come and go over the river. He said, "No; I don't want to go over in Kentucky." Finally they got him out, and about the time they got him out the train arrived, and he wanted to get on. Mr. Glockner— I could not say now whether anybody else had hold of him. Anyway, he got away from Mr. Glockner and went to the rear coach. The door was fastened, and he got off and came to the next, and got on, and some one said: "Don't let him on there. He hasn't got any money." And then he went in the coach, and came back out. He said, "I have got money," and pulled out a sack with some money in it.'

"The witness Johnson testified as follows: 'Q. When did you first notice him on the train? A. When the collector told him to get off. Q. Did he get off? A. No, sir. Q. What did he do? A. Well, my recollection is, he asked the collector why he should get off. The collector told him, because he had no money. He says, "You have got no money." Q. Did Korn reply to that? A. He did; put his hand in his pocket and took out a bag, which I supposed contained silver—twenty or twenty-five dollars. I don't know how much, but I know it was silver. I thought that was what it was. He satisfied the collector, at least, he had money. Q. What happened then, if you remember? A. There was nothing else done. The collector and conductor went on about their business until the train stopped. Korn, if he did anything—I don't remember—only walked up and down the aisle. Q. Do you remember whether he sat down in the car? A. I have no recollection of seeing him. I don't think he took a seat. Q. Did he attract your attention after the train started? A. Not until the collector asked for his fare. Q. Then what happened? A. The collector asked him where he was going, and he told him he was going to hell. Q. Go on. A. The collector then insisted on him telling where he was going, and said he must have his fare. I

don't recollect the words he said, but it was a good deal the same line as he answered the first time; and after a few words the conductor pulled the cord, and the train stopped, and the conductor and the collector each took hold of an arm and led him off.'

"The witness Ruane testified: 'Korn came in and leaned his arm up against the seat I was occupying. I had sat down, you know. He leaned his arm up against that seat. Q. Then what happened? A. The conductor told him he couldn't ride on that train. He says, "You cannot ride on this train, for you haven't got no money." Q. Go on. A. He then reached in his pocket—overcoat pocket—and produced a little sack, something like a shot sack, I guess ; and he said he had enough money to buy that road. Then they started the train. Q. Then what happened, Mr. Ruane? A. The collector came in from the front of that car—came in and walked back—and he says, "Fare." He didn't answer him then, and he says the second time; he says, "Fare;" and he says to Korn, then, "Where are you going?" and Korn said, says he, "None of your damned business." The conductor stood right behind the collector when he made this remark, so he pulled the bell cord, and they stopped and put him off the train. Q. Was Korn sitting on the arm of your seat during this conversation? A. He was leaning on it; yes, sir; leaning on it.'

"He was put off the train about 7 o'clock in the evening of the 28th of January, 1898, about 300 yards from the station, and within the yard limits of the station in the outskirts of the little village of Springville or South Portsmouth. The weather was near the freezing point, and during the night there was a light snow. In the morning he was found dead within 25 feet of the railroad track, near several houses, two of which were within about 50 feet of the place where the body was found. His hat was folded under his head, and he was lying in a natural position, and his skin was still soft and pliable. There was found on his person, as stated by Dr. Titus, a little of some kind of liquor, and about a dram bottle half full of cocaine hydrochlorate in fine crystals; and, in answer to questions, Dr. Titus testified as follows: 'Q. You spoke of a bottle partly filled with liquor being found. What did you mean by that? A. It was a liquor containing alcohol. Q. About how much had been used from the bottle of cocaine? A. About half. There are sixty grains in a bottle. Q. Do you know what quantity taken internally into the system may result fatally? A. The books give as a fatal dose from half a grain to twenty-two grains.'

"In answer to a question, the witness Ruane testified as follows: 'A. Well, when the conductor spoke to him, and stopped the car and put him off, he says, "I might as well get off here as any place, for I am going to hell anyhow." That was the only words he used.'

"He was well educated, had studied medicine and pharmacy, and had carried on business as a druggist for some time. The witness John J. Korn testified that there was a woman in the case."

This is the substance of the facts as shown by the plaintiff's evidence.

W. Stilwell and Frank S. Monnett, for plaintiff in error.

Henry Bannon and John Galvin, for defendant in error.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

RICHARDS, Circuit Judge, having made the above statement of the case, delivered the opinion of the court.

The right of a conductor of a passenger train to eject one who refuses to pay his fare, or is drunk and disorderly, is unquestioned, but not absolute. It is subject to limitations. In exercising it, due regard must be had to the condition of the person to be ejected, and the situation in which he will be placed when ejected. One helpless from any cause, and incapable of taking care of himself, must not be treated as one in the full possession of his faculties. In every case

care must be taken to expose the person ejected to no unusual or unnecessary hazard. At the same time, the conductor is responsible for his train, and it is not only his right, but may be his duty, to eject a trespasser or a drunken and disorderly passenger. Obviously, in doing this, he must, to a large extent, act upon appearances and in the light of probabilities. All the law requires is that he shall use reasonable care and caution. To the conductor, Korn presented himself as a young man under the influence of liquor, but sensible of his surroundings and capable of controlling his movements. It is true, the conductor was told he was not fit to travel; but this was coupled with the information that he had no money, and the reasonable inference was he was not fit to travel because he had no money. After it was reported that he had money, no other reason being suggested why he was not fit to travel, the conductor naturally said, "I guess we will have to take him," and the train was started. Immediately the episode occurred which resulted in Korn's ejection from the train. Having displayed his money when the train was at the station, he refused, with an oath, to pay his fare, or say where he wanted to go, after the train got under way. So the train was stopped, and he was put off. There was nothing about him at this time to indicate that he was helpless and unfit to take care of himself. He had insisted on getting on the train, and succeeded, despite the plan of the station agent to take him to Portsmouth; he had walked up and down the aisle of the car; he had shown his money, with a boast, when told he had none; and finally, when put off for refusing to pay his fare, he went without resistance, saying, "I might as well get off here as any place, for I am going to hell anyhow." None of these things indicated incapacity of either mind or body, but rather the reverse. He was boastful, rude, and reckless, as drunken men frequently are; but he seemed to know what he was about, and to be able to do what he desired.

It is to be observed, moreover, that the conductor did not have presented to him the case of a passenger bound for a known station. Korn had no destination, and, when the conductor asked him where he was going, replied, "None of your d——d business." Under these circumstances, with the train just started, and the knowledge that there were persons at the station who had tried to keep Korn there, the apparently proper and prudent thing was to stop the train at once and put him off. And this was done. He was put off 300 yards from the station, within its yard limits, in the outskirts of the village of Springville, about 7 o'clock at night, with two lighted houses not 50 feet away, and within easy call. The conductor must have believed, as he stated to a passenger, that he was leaving him "not far from friends." The next morning the young man was found dead not more than 25 feet from the track at the place he was put off the train. He was lying on his back in a natural position, his hat folded under his head. A bottle with a liquor containing alcohol and a drachm bottle half full of cocaine were found upon his person. One physician thought he died from exposure; another, from cocaine poisoning. Whatever the cause of death, it was plain he had invited its coming, and silently awaited its work. There were lighted

houses in sight, but he started for none of them. There were people near, but he called to none of them. When he stepped off the train saying, "I might as well get off here as any place, for I am going to hell anyhow," his last trip here had ended, and he was evidently contemplating a longer journey.

We think the conductor was justified in ejecting Korn, under the circumstances; but, if his act was wrong, we fail to see any connection between it and Korn's death. Korn was not put off in a dangerous place, nor at a dangerous time, nor under dangerous circumstances. His death was not occasioned by any danger which the conductor could have foreseen. The only danger to which the ejection could expose Korn was the danger of being able to do what he desired; and he would have been exposed to this danger if he had been put off at the next station, or if he had never got on the train at all.

But it is insisted that, in point of fact, Korn was helpless through the use of cocaine, and that the station agent was aware of this, and that his knowledge must be imputed to the company, although not communicated to the conductor. It does not appear from the record that the station agent was fully advised as to Korn's condition, and the cause of it. The young man was apparently in a drunken stupor much of the afternoon, but, revived by the fresh air, he threw off the stupor upon the arrival of the train, and resumed control of himself. He refused to return to Portsmouth, and insisted on taking the train. Then the agent dropped the attempt to control him, and returned to Portsmouth. As a matter of humanity, he had done what he thought he could. He was under no obligation to arrest Korn and place him under detention. The circumstances would hardly have justified such action on his part. But if the agent did know Korn's condition, such knowledge cannot be imputed to the company, because it was not his duty either to pass upon Korn's fitness to travel, or to lay before the conductor information on that point. The knowledge of the agent to be imputed to the company must affect some matter lying within the scope of the agent's authority. It must be a part of the agent's duty either to act upon the information himself, or lay it before others for action. Information thus received by the agent is imputed to the company because the company is presumed to be present, acting in the very matter to which the information relates. Mechem on Agency, § 725; Story on Agency, § 140; Waynesville National Bank v. Irons (C. C.) 8 Fed. 1; Congar v. Railway Co., 24 Wis. 157, 1 Am. Rep. 164. Now, it was not the station agent's, but the conductor's, business to decide whether Korn should be permitted to enter the train and remain on it, or should be rejected or subsequently expelled. Moreover, if the station agent had told the conductor all he knew about Korn, the conductor would still, in our opinion, have been justified in receiving him as a passenger, and in subsequently ejecting him upon his refusal to tell where he was going and to pay his fare. The conductor necessarily assumed, when Korn boarded the train and showed his money, that he had a place of destination, and that he would pay his fare. There was nothing in Korn's condition or conduct which would have made

it wrong for the conductor to receive him and carry him as a passenger. That he had no destination and would pay no fare was not known and could not be anticipated by the conductor. The conductor therefore did right in receiving him as a passenger, and, for the reasons we have given above, did not do wrong in ejecting him when he acted as he did.

Agreeing with the trial judge that there was a failure of proof upon essential points, the judgment of the court below is affirmed.