## WATSON *v.* SOUTHERN RAILWAY COMPANY.

1. The verdict in this case was demanded by the evidence.
2. The judgment of the court below refusing a new trial being affirmed upon the ground that the evidence demanded a verdict in favor of the defendant, it is unnecessary to consider the other assignments of error.

Argued November 12, 1908.—Decided May 12, 1909.

Action for damages.   Before Judge Pendleton.   Fulton superior court.   April 18, 1908.

The plaintiff alleged, that, being a passenger holding a ticket entitling him to transportation, he was wrongfully and tortiously ejected from a passenger-train of the defendant company by the conductor.   After the evidence was closed for both sides, and before the court began the charge to the jury, the plaintiff offered an amendment to his petition, which the court refused to allow. The jury returned a verdict for the defendant.   The plaintiff's motion for a new trial was overruled.   He excepted to each of the rulings just stated.   For the other facts see the opinion of the court.

*H. W. Dent* and *W. R. Hammond,* for plaintiff.

*Dorsey, Brewster, Howell & Heyman,* for defendant.

BECK, J.   In the petition as originally filed it is alleged, in substance, that the plaintiff boarded the Birmingham train at night with a ticket authorizing him to travel from Atlanta to Birmingham; that he took his seat in a passenger-coach of the train, and after it had proceeded a short distance from the terminal station the conductor of the train came to petitioner, and without asking him for his fare or his ticket, or giving him an opportunity to produce his ticket, caught him roughly by the arm and told him that he had to get off the train; and summoning the porter to assist him, he violently and forcibly dragged petitioner to the door of the car, then out on the platform, and shoved and kicked him off of the train, without any provocation whatever on the part of petitioner. Plaintiff averred that he was behaving himself properly, and that there was no reason why he should have been treated in the manner described.   In the declaration it is averred that plaintiff was mortified and humiliated, and other elements of damage were alleged. The case proceeded to trial, and on the trial the plaintiff testified that he went into the car and went to sleep, and the next thing he knew they were putting him off the train.   Petitioner asked them what they meant by it, and before he could realize what they were doing he struck the ground.   He does not remember what the conductor said to him until after he had been put off the train.   He testified that the conductor did not ask him for his ticket, or for anything.   In the amendment which was disallowed the plaintiff averred that the defendant failed in its duty to him as a passen-

ger, in that he was in a weak physical condition by reason of loss of sleep, and was exhausted; that he was sound asleep when the conductor came along to take up his ticket; that he was also under the influence of drugs and medicine taken because of his sickness; that the conductor aroused him suddenly, or attempted to do so, and, before petitioner was fully aroused and before he was at himself or knew what he was doing, "hustled" him off of the train without giving him an opportunity, after he became conscious of what was going on, to pay his fare or deliver his ticket; and that petitioner, in his weak and excited condition, was wholly unable to understand the situation and to appreciate what was going on, and for this reason failed to tender his ticket, but "was hustled off" before he had time to do so. And in the second division of the amendment to the petition it is averred that the conductor, by the exercise of proper care, could and ought to have ascertained petitioner's condition, and ought to have waited on petitioner until he was fully aroused and fully at himself, and was fully conscious of his surroundings; and that the conductor failed to exercise toward petitioner the degree of care required by law, and that if he had done so it would have been unnecessary to eject plaintiff from the train.

Conceding that the amendment was germane to the cause of action as originally stated in the petition, we do not think that its rejection is cause for a new trial; as, under the evidence in the case, a verdict for the defendant was demanded. It is to be remembered that this amendment was tendered after the evidence for both sides had been concluded. Its rejection did not deprive plaintiff of the right to introduce evidence in his favor. He had already introduced, under the allegations of the original petition, all of the evidence bearing upon the allegations in the amendment which he desired or was able to furnish. That the plaintiff was ejected from the train is undisputed, but his ejection was the result of provocation given by him and conduct upon his part that imperatively required the conductor, in the discharge of the duty which he owed to the railroad company and to other passengers in the car, to remove the plaintiff from the train. The evidence establishing the fact of the provocation given by the plaintiff and of such gross misconduct on his part as necessitated his ejection, is not controverted in the testimony of the plaintiff himself. He

testified that he was not in a condition to know what occurred between himself and the employees of the defendant company in charge of the train before he was carried to the door and platform of the coach in which he was riding. But the undisputed testimony of the conductor and five passengers shows that the conductor, before undertaking to eject the passenger, had courteously demanded his ticket, and that he patiently waited even longer than could have been expected of him under the circumstances as developed in the evidence which we find in the record.

The conductor testified: "I went to him and asked him for his ticket, and he told me he didn't have any ticket. I asked him where he was going, and he said he wasn't going anywhere, he was going to stay here. I said, 'Well, you must have a ticket somewhere. Feel in your pockets and see if you haven't got a ticket.' He said, 'No, I haven't got a ticket.' I said, 'Well, you will have to pay your fare then.' He said, 'No, I won't, pass me on by.' I said, 'No, I can't do that; you will have to give me a ticket or your fare one.' He said, 'Well, I won't give you nothing.' I talked with him, I reckon, five minutes, begging him to give me his ticket, or tell me where he was going, or pay his fare, or something, and he cursed me for everything nearly. He said, 'God damn you, I am not going to give you nothing,' or something like that. 'To hell with you. What in the hell is the matter with you?' There were some ladies on the seat behind him, and some more across the aisle, and I said, 'You will have to get off if you won't give me your ticket, or pay your fare. If you curse me in the presence of these ladies, I will have to put you off.' That's when he jumped up and said, 'What in the hell is the matter with you.' I pulled the bell-cord first and stopped the train, and pulled him out in the aisle and carried him on out and put him off. That was in the first-class coach. He was on the left-hand side, about the second or third seat. I saw a bottle; he tried to hit me with it. He got it out of his pocket. It looked like whisky; it looked red. I just pushed him along in front of me—caught him by the arm and got him out in the aisle and pushed him along. I did not strike him with my feet or my hands, or use any abusive language to him. I treated him as nice as a man could. The train was stopped and was standing still. I had the porter to get off on the ground and handed his grip and overcoat to the porter, and I also had the

porter to hold him to keep him from getting back on the train. . . He did not seem unnatural, only in the way he talked. He did not appear as if anything was the matter with him. I can't say he was under the influence of liquor. I don't remember whether I smelled whisky on him or not. He didn't look like a sick man to me. He looked all right. I know I couldn't hardly do much with him, and I am pretty stout. He gave me all I wanted to get him off. He did not act like a drunk man. He wasn't feeble at all. He was a stout man. He tried to hit me all the way from the time we started until we got him off. There was no occasion whatever for him to treat me that way. I did not say a thing out of the way to him or to irritate him. I said to him, 'You will have to give me your ticket or pay your fare.' Every time I asked him for a ticket he said he didn't have a ticket, and refused to pay his fare."

The testimony of the conductor is corroborated by that of several witnesses who were passengers in the coach where the plaintiff was and from which he was ejected. One of these passengers, Mrs. Ulmer, testified: "When I went on the train I told the conductor to wake me up when we got to Austell. When we got a little way out of town, I thought I was near Austell. I heard a commotion in the train, and a gentleman using some pretty bad language, and the conductor was carrying him out. . . I don't remember seeing him go out of the train. When I heard the commotion I woke up. I just heard a few words pass as the conductor and the man was coming out. The other man was resisting against the conductor. The passenger was doing the cursing. . . I don't know whether the man was drunk or not. I didn't see him take a drink. I was asleep when the conductor went to him, and didn't see him. I was not certain who was doing the cursing, but imagine the passenger was doing it."

Mrs. Roberts, who was a passenger, testified: "I remember the plaintiff on that train. He was asleep, and the conductor came and woke him up and asked him for a ticket, and he said he didn't have any, and refused to give it up. He [the conductor] told him, 'You must hunt your ticket up by the time I come through again.' He went on and took up the rest of the tickets, came back and asked him for his ticket again; and he got mad and said he wasn't going to give him any ticket, he didn't have any; and he drew a

bottle out of his pocket. I thought it was a gun. He cursed, and. the conductor stopped the train and put him off. Mr. Watson never gave him his ticket or paid his fare. He did the cursing. The conductor did not curse any, nor did he strike Mr. Watson in the coach. Nobody in there cursed except Mr. Watson. . . I don't remember what Mr. Watson said, if anything, to my husband. He did not say anything to him directly. He was just kinder throwing his arms, fighting like. . . Mr. Watson impressed me as being drunk. He acted very unreasonably and foolishly. The conductor did not do or say anything to irritate him. He only asked him for his ticket. Mr. Watson just cursed and refused to pay his fare. I don't remember his words. I was right across the aisle from him.".

R. E. McEver testified: "I had been losing right smart sleep up to that time, and I went to sleep when I went in that car. I left the ticket where the conductor could get it. . . What woke me up was that argument about a ticket. The conductor asked a man, I suppose Mr. Watson, though I couldn't swear who it was, for a ticket; and he told him he didn't have a ticket. He asked him where he was going, and he said he wasn't going anywhere. . . He told him he would put him off the train. He told him he would do no such thing. I don't remember the argument exactly, but words to that effect; and then he proceeded to put him off. There was some cursing done there by the passenger. . . The man drew a bottle from his pocket, which looked like a pint bottle. . . He made a motion like he was going to hit him [the conductor], but I don't think he tried very hard to hit him. . . The man was drunk. . . The conductor made the remark 'I will put you off.' He said, 'You won't do no such a God damn thing.'"

G. D. Roberts, sworn by the defendant, gave testimony corroborating the conductor and the other witnesses who had testified for the defendant, showing that the conductor was patient, courteous, and reasonable, and that he only ejected the plaintiff from the train when it became his imperative duty to do so. There is other testimony in the case, corroborative of the witnesses for the defendant whom we have named above; but it is unnecessary to set out more of the evidence. No circumstance is testified to either by the plaintiff himself or any of the witnesses which would have

authorized the jury to have found that it was the duty of the conductor to have waited longer before ejecting the plaintiff, after the grossly improper conduct of which he had been guilty. All the evidence indicates that the passenger was drunk and boisterous; and if it be true, as he now insists, that he was afflicted with some malady which, together with the medicines and drugs which he had taken, caused him to be in the condition in which he was on the night in question, then his malady and the drugs which he had taken produced in him a condition which, tested by all the objective symptoms, was so exactly similar to the condition, mentally and physically, of an intoxicated man, that the conductor of the train could not possibly distinguish between the passenger's conduct and that of a man who had been drinking intoxicants to excess. The conductor's duty, under circumstances like those which we have detailed above, is thus defined in the opinion written by Mr. Justice Lumpkin, in the case of *Hillman* v. *Railroad Company,* 126 *Ga.* 814 (56 *S. E.* 68) : "A railroad company is bound to use extraordinary care and diligence to protect its passengers, while in transit, from violence, injury, or outrage and humiliation by third persons. This protection must be afforded by the conductor to the extent of all the power with which he is clothed by the company or by the law; and his failure to afford it, when he has knowledge that there is occasion for his interference, will subject the company to liability in damages." In 2 Hutchinson on Carriers, page 1122, it is said: "The passenger, from the time he enters his vehicle, has the right to claim the protection of the carrier from the insults and violence of others, whether entering it as passengers or not; and the law exacts from him the prompt employment of all means at his command to protect the passenger against such outrages, either by quelling the disturbance or by the expulsion of those engaged in it, if necessary. In such an emergency, the duty of the carrier is said to be the same as that which he is under in other respects, to do all that can be done to insure the safety of the passengers." In the case of Vinton *v.* Railroad Company, 11 Allen, 304 (87 Am. D. 714); it was said: "The right and power of the defendants and their servants to prevent the occurrence of improper and disorderly conduct in a public vehicle is quite as essential and important as the authority to stop a disturbance or repress acts of violence or breaches of

decorum after they have been committed, and the mischief of annoyance and disturbance have been done. Indeed, if the rule laid down at the trial be correct, then it would follow that passengers in public vehicles must be subjected to a certain amount or degree of discomfort or insult from evil-disposed persons before the right to expel them would accrue to a carrier or his servant. There would be no authority to restrain or prevent profaneness, indecency, or other breaches of decorum in speech or behavior, until it had continued long enough to become manifest to the eyes or ears of other passengers. It is obvious that any such restriction on the operation of the rule of law would greatly diminish its practical value." See also the case of Korn *v.* Railway Company, 125 Fed. 897 (62 C. C. A. 417) ; and 4 Elliott on Railroads, §1837, and cases cited.

While, under the circumstances and facts shown by the evidence in the record, the conductor had the right and was under the duty to eject the plaintiff from the train, it was also his duty to observe due care and diligence to avoid inflicting upon him any personal injury, and not to use violence or unnecessary force in removing him from the train, as well as to see that the ejected passenger was not placed and left in an unsafe or dangerous locality; and we assume, inasmuch as there is no complaint as to the charge of the court upon this branch of the case, that the law relative thereto was properly stated to the jury by the court in his instructions to them.

Having held that the evidence in the case demanded a verdict in favor of the defendant, it is unnecessary to deal with the specific assignments of error upon the refusal of the court to give in charge certain instructions contained in written requests. *Kelly & Jones Co.* v. *Moore,* 128 *Ga.* 683 (55 S. E. 181).

*Judgment affirmed. All the Justices concur.*